**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Mother Doe, on behalf of Jane Doe, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 2:13-cv-3529-PMD |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Berkeley County School District; | ) | |
| Berkeley County School Board; | ) | |
| Berkeley Middle School; and | ) | |
| Michael Wilkerson, Michelle Spina, | ) | |
| Blake Culbertson, Dorothy Ard, | ) | |
| Annette Addison, Shanae Brown, | ) | |
| Anthony LeRoy Chester, and Jovita | ) | |
| Smith, in their respective individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on two motions for summary judgment: one filed by Defendant Shanae Brown (ECF No. 64), and another filed jointly by the other defendants—Berkeley County School District, Berkeley County School Board, Berkeley Middle School, Michael Wilkerson, Michelle Spina, Blake Culbertson, Dorothy Ard, Annette Addison, Anthony Chester, and Jovita Smith (ECF No. 76). For the reasons stated herein, Brown's motion is granted, and the remaining defendants' motion is granted in part and denied in part.

## BACKGROUND

Jane Doe was born with Williams Syndrome, a genetic disorder. People with Williams Syndrome tend to be extraordinarily outgoing, have poor understandings of appropriate levels of physical contact with others (e.g., hugging new acquaintances instead of shaking hands), and lack the ability to make inferences about the intentions and behaviors of those with whom they so freely interact. Consequently, they tend to be at risk of exploitation and can require an

elevated degree of supervision. Jane has been documented as possessing many of the characteristics typical of people with Williams Syndrome.

In 2012, Jane began attending Berkeley Middle School ("School") in the Berkeley County School District ("District"). Due to her condition, Jane was entitled to receive special education and other services from the School under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, *et seq.* Upon enrollment, Jane, her Mother, and School officials developed an individualized education program ("IEP") for Jane, pursuant to the IDEA. *See* 20 U.S.C. §1414(d). Jane's IEP provided, *inter alia*, that Jane would spend the majority of her school days in a self-contained classroom with other special education students, but would be allowed to attend certain classes, such as health and physical education, with non-disabled students. At the meeting to develop the IEP, Mother was assured that students at the School "are always accompanied by an adult." (2nd Am. Compl., Ex. B, Meeting Notes, ECF No. 37-2, at 1.) In accordance with the IEP, Jane was placed in a special education class for students with mild intellectual disabilities, taught by Katherine Perry.

Perry's was not the only special education class at the School. For example, a Mr. Tabor taught a class of autistic children. Three special education assistants worked in Tabor's class: Defendants Dorothy Ard, Annette Addison, and Shanae Brown. Ard and Addison assisted all the students in Tabor's class. However, Brown was assigned to assist and supervise only one particular impaired student for the entire school day.

Defendant Jovita Smith worked as a special education paraprofessional in Perry's class. Smith's duties included assisting Jane and other students in the classroom and escorting them around campus. For example, when it was time for Jane to attend health and physical education class, Smith escorted her from Perry's classroom to the girls' locker room. Smith would watch

Jane go into the locker room but would not follow her into it. According to Smith, once Jane entered the locker room, it became the health and physical education teacher's responsibility to supervise her.

Physical education classes at the School are single-sex. Defendant Michelle Spina taught the female students, and Defendants Anthony Chester and Blake Culbertson taught the male students. Every two weeks, health and physical education classes alternated time between the School's gym and a classroom connected to it; girls had physical education in the gym while boys were in the classroom learning health, and vice versa. In addition, special education classes containing students of both sexes would use the gym alongside the single-sex physical education classes. For example, Tabor's class used the gym during seventh period, which was the same period Jane spent in Spina's class. When Tabor's class used the gym, Addison and Ard supervised their students, while Brown attended to her one assigned student.

At the beginning of the health and physical education period, Spina would meet her students in the locker room. Spina expected her students to report to the locker room at the beginning of the class period and then, in accordance with the rotating schedule discussed above, proceed either to the gym for physical education or to the adjacent classroom for health instruction. Spina took attendance each day and, according to her, she reported absences and would also report students who she caught skipping class.

A video camera was mounted in the gym. Footage from the camera shows that on several days in January and February of 2013, Jane did not report to the health classroom on days when Spina was teaching health. Instead, Jane stayed in the gym. In some of the footage, Jane can be seen wandering around the gym with no adults present. Other footage shows Jane in the gym while Chester and Culbertson were conducting the boys' physical education class and while

Tabor's students were present with Addison, Ard, and Brown.  Spina noted Jane's absences on some of those days.  On others, however, Spina marked Jane as present even though Jane was in the gym.  In addition, Spina never required Jane to make up any missed assignments and, in fact, gave her a grade of 100% in health.

Spina was aware that Jane was a special-needs student but did not specifically know that Jane had Williams Syndrome.  Spina does not recall being advised that Jane specifically needed constant adult supervision, and Spina did not feel it was necessary that she keep an eye on Jane at all times.  Spina denies that she ever allowed Jane to skip her class.  However, according to Addison, Spina asked her to watch Jane in the gym on one occasion.  On that day, and on others, Addison and Ard would supervise Jane in the gym.

C.K. was a male student who had health and physical education class at the same time as Jane.  Thus, when C.K. was taking physical education in the gym, Jane should have been in the health classroom, and vice versa.  As discussed above, however, there were several days when Jane was in the gym with C.K. and other boys.  Indeed, the video footage appears to show Jane and C.K. interacting on at least one of those days.

On one of the days that Jane was in the gym with C.K., the two of them talked while they stood in front of bleachers.  During that conversation, C.K. put his hands down Jane's pants and touched her inappropriately.  Jane did not consent and told him to stop.  Eventually, he did, and she walked away.  Despite the presence of several adults—Addison, Ard, Brown, Chester, and Culbertson—and many other students in the gym, no one saw the incident.  The abuse cannot be seen from the security camera's footage.

Jane initially kept the abuse to herself but eventually revealed it to her Mother.  Jane and her parents went to the police and then to Defendant Michael Wilkerson, the School's principal.

Wilkerson investigated the matter but, believing evidence of the assault was lacking, took no disciplinary action against C.K.

## PROCEDURAL HISTORY

Acting on behalf of Jane, Mother sued Defendants for Jane's abuse. Mother asserts two causes of action against the District, the Board, and the School: Disability discrimination under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, and Disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). She also asserts claims of denial of substantive due process under 42 U.S.C. § 1983 against the District, the Board, and the individual defendants. Finally, Mother asserts a gross negligence claim against the District.[1] Mother seeks damages, attorneys' fees, costs, and mandatory injunctive relief.

While the discovery period was still open, on July 7, 2015, Brown moved for summary judgment. Mother filed a Response in opposition on July 17. Brown filed a Reply on July 27. After the discovery period closed, on October 15, the other defendants filed their joint motion for summary judgment. Mother filed a Response in opposition on November 2. Both motions are now ripe for consideration.

## JURISDICTION

The Court has subject matter jurisdiction over Mother's federal-law claims pursuant to 28 U.S.C. § 1331. Under 28 U.S.C. § 1367(a), the Court has jurisdiction over Mother's related

---

1. Mother originally included the Board and the School in her gross negligence claim, but she has since decided to pursue the claim only against the District. (*See* Pl.'s Mem. Opp'n Defs.' Mot. Summ. J., ECF No. 80, at 2 n.2.) The Board and the School contend, however, that they are not proper parties to any of Mother's claims because they are merely parts of the District and thus are not distinct legal entities amenable to suit. Mother has not responded to that assertion. Accordingly, the Court finds Mother has conceded that issue, and it dismisses the Board and the School from this case. *See, e.g., Mejica v. Montgomery Cty.*, No. CIV.A. RDB-12-823, 2014 WL 4634298, at *4 (D. Md. Sept. 15, 2014) ("A non-moving party abandons a claim where the party fails to respond to an argument raised in a dispositive motion."); *Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons [her] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (holding that plaintiff's failure to address defendant's arguments for summary judgment in opposition brief constituted abandonment of claim).

state-law claim because it is so related to the federal-law claims that it forms part of the same case and controversy.

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The court is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). "[I]t is ultimately the nonmovant's burden to persuade [the court] that there is indeed a dispute of material fact. It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citations omitted). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## DISCUSSION

### I.    Exhaustion of Administrative Remedies

Most Defendants[2] contend that all of Mother's federal claims must be dismissed without prejudice because Mother failed to exhaust her administrative remedies under the IDEA before she filed suit.

---

2.    Every defendant except Brown has raised failure to exhaust as a basis for granting summary judgment. For ease of reference, in this section, "Defendants" means every defendant except Brown.

The IDEA provides "a panoply of procedural rights" and administrative remedies for parents to employ for the protection of their disabled children's educational needs. *Sellers by Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 527 (4th Cir. 1998). Typically, plaintiffs must exhaust all administrative remedies available to them under the IDEA before they file a civil action for violation of the IDEA. *See, e.g.*, *Reid v. Prince George's Cty. Bd. of Educ.*, 60 F. Supp. 3d 601, 606 (D. Md. 2014). The IDEA's exhaustion requirement also applies to lawsuits alleging violations of the Constitution, the ADA, § 504 of the Rehabilitation Act, "or other Federal laws protecting the rights of children with disabilities" if the plaintiff is "seeking relief that is also available under" the IDEA. 20 U.S.C. § 1415(l). "However, a plaintiff is exempt from this exhaustion requirement if 'the administrative process would have been futile.'" *Reid*, 60 F. Supp. 3d at 606 (quoting *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 536 (4th Cir. 2002)). "[F]ailure to exhaust is an affirmative defense that must be plead and proven by the defendant." *Augustine v. Winchester Pub. Sch. Dist.*, No. 5:13CV00025, 2013 WL 5347465, at *3 (W.D. Va. Sept. 17, 2013).

Defendants assert Mother and Jane did not exhaust their administrative remedies before Mother filed suit, and Mother does not directly dispute that assertion. Instead, the parties argue at length whether Mother's federal-law claims seek relief that is "also available under" the IDEA, thus triggering § 1415(l). The Court finds it unnecessary to answer that question. As the Court explains below, even if Mother seeks relief that the IDEA could also provide, applying the exhaustion requirement would not be appropriate.

"'[A]pplication of the exhaustion doctrine is intensely practical,' such that 'deciding whether to waive exhaustion should be guided by the policies underlying the exhaustion requirement.'" *Southard v. Wicomico Cty. Bd. of Educ.*, 79 F. Supp. 3d 552, 559 (D. Md. 2015)

(quoting *J.B. ex rel. Bailey v. Avilla R–XIII Sch. Dist.*, 721 F.3d 588, 594 (8th Cir. 2013) (quotation marks from *J.B.* omitted)). "The IDEA's 'exhaustion provision is designed to allow[ ] for the exercise of discretion and educational expertise by state and local agencies, afford [ ] full exploration of technical educational issues, further[ ] development of a complete factual record, and promote[ ] judicial efficiency by giving . . . agencies the first opportunity to correct shortcomings in their educational programs for disabled children.'"  *Id.* at 559–60 (quoting *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 875–76 (9th Cir. 2011) (en banc), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc) (quotation marks from *Payne* omitted)); *see J.B.*, 721 F.3d at 594 ("'Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.'" (quoting *Bowen v. City of New York*, 476 U.S. 467, 484 (1986))); *see also Doe v. Bd. of Educ. of Washington Cty.*, No. CIV. JFM-15-00074, 2015 WL 4716065, at *7 (D. Md. Aug. 6, 2015) ("The procedural safeguards provided by the IDEA are designed to allow parental involvement with their child's ongoing education, and envisions parents and the school jointly addressing problems that arise."). Consistent with those policies, "the principal form of relief under the IDEA is *prospective* benefits, in the form of education accommodations." *Reid*, 60 F. Supp. 3d at 606; *see Doe*, 2015 WL 4716065, at *7 ("The IDEA is necessarily forward-looking, and is not 'a forum for tort-like claims of educational malpractice.'" (quoting *Sellers*, 141 F.3d at 527)).

When Mother filed this action in December 2013, she and Jane lived in South Carolina, and Jane was still of an appropriate age to attend the School. However, in the fall of 2014, Jane

entered high school, and in May 2015, Mother and Jane moved to North Carolina. There is no longer any opportunity for the District or the School to "correct its own errors," *J.B.*, 721 F.3d at 594 (citation and quotation marks omitted), or for Mother, the School, and the District to "jointly address[]" any needs Jane may have due to being molested, *Doe*, 2015 WL 4716065, at *7. At this point, the District has neither the obligation to pay for Jane's special education needs nor the power to create enforceable accommodations for her. *See Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 651 (3d Cir. 2000) ("[T]he IDEA's overall scheme and the precedent interpreting that scheme lead[] inexorably to the conclusion that when a student moves from State A to State B, any prior IEP in effect in State A need not be treated by State B as continuing automatically in effect"); *M.E. ex rel. C.E. v. Bd. of Educ. for Buncombe Cty.*, 186 F. Supp. 2d 630, 640 n.8 (W.D.N.C. 2002) ("The fact that an IEP had been developed for [the disabled child] in Maryland had no bearing on any North Carolina public school system . . . ."), *rev'd and remanded on other grounds sub nom. M.E. ex rel. C.E. v. Buncombe Cty. Bd. of Educ.*, 72 F. App'x 940 (4th Cir. 2003) (per curiam); *Pestronk v. District of Columbia*, 150 F. Supp. 2d 147, 149 (D.D.C. 2001) ("Congress requires states to ensure that 'all [special needs] *children residing in the State* . . . who are in need of special education and related services are identified, located, and evaluated . . . .' The express statutory language of the IDEA demonstrates that Congress did not intend for one state to bear the cost of specialized education for special needs children residing in another state." (quoting 20 U.S.C. § 1412(2)(C)). Under these circumstances, making Jane and Mother engage the local administrative process in an effort to seek prospective relief from a school that, due to geography and educational advancement, Jane cannot attend would be both futile and inconsistent with the purposes of the IDEA's exhaustion requirement. *See Learning Disabilities Ass'n of Md., Inc. v. Bd. of Educ. of Baltimore Cty.*, 837

F. Supp. 717, 723 (D. Md. 1993) (stating that, in determining whether to apply an exception to the IDEA's exhaustion requirement, courts consider "'whether the pursuit of administrative remedies under the facts of a given case will further the general purposes of exhaustion and the congressional intent behind the administrative scheme.'" (quoting *Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1300, 1302–03 (9th Cir. 1992))).

Defendants argue that Mother and Jane's relocation to North Carolina does not excuse their failure to seek administrative relief. Defendants rely on *N.B. by D.G. v. Alachua County School Board*, a case in which a plaintiff, without first seeking administrative relief, sued several school districts for violating her disabled child's IDEA rights. *See generally* 84 F.3d 1376 (11th Cir. 1996) (per curiam). When two of the school districts moved to dismiss for failure to exhaust, the plaintiff argued that exhaustion would be futile because the child no longer attended any of the defendant school districts. *Id.* at 1379. The district court rejected that argument, stating that "[i]f parents can bypass the exhaustion requirement of the IDEA by merely moving their child out of the defendant school district, the whole administrative scheme established by the IDEA would be rendered nugatory." *Id.* The plaintiff appealed, and the Eleventh Circuit summarily affirmed by adopting the district court's opinion. *Id.* at 1377.

*N.B.* is readily distinguishable. In that case, the courts recognized that one of the purposes of the IDEA's exhaustion requirement "is to prevent deliberate disregard and circumvention of agency procedures established by Congress." 84 F.3d 1376 (citation and quotation marks omitted). Further, in *N.B.*, the child moved away before the lawsuit was filed. *See* Brief of Appellant at 3, 7, *N.B. by D.G. v. Alachua Cty. Sch. Bd.*, 84 F.3d 1376 (11th Cir. 1996) (per curiam), 1996 WL 33479790, at *3, *7. Thus, in *N.B.*, "bypass" referred to the act of relocating a child and then filing a lawsuit. In that context, rejecting the plaintiff's relocation

argument was a sensible way to uphold the anti-manipulation purpose of exhaustion requirement. Attributing legal significance to a pre-suit change of residence would leave schools without any opportunity in litigation to raise failure to exhaust and courts powerless to enforce the exhaustion requirement even in the earliest stage of a case; the opportunity for meaningful administrative review would end before the action was commenced. That, in turn, would invite precisely the type of preemptive manipulation that the exhaustion requirement is meant to prevent.

Here, in contrast, nothing about Mother and Jane's relocation suggests a deliberate attempt to circumvent the IDEA, and the timing of the move in no way prevented the exhaustion issue from being raised in a meaningful way. Mother and Jane moved to North Carolina nearly eighteen months after Mother initiated this action, and over a year after Defendants first raised failure to exhaust in their answer to the First Amended Complaint. Nothing about that scenario suggests that Mother uprooted her family in an effort to short-circuit the IDEA's procedural mechanisms. The concerns that motivated the decisions in *N.B.* simply are not present here.[3]

In addition, there are significant differences between the procedural posture in *N.B.* and the manner in which Defendants raised exhaustion in this case. The defendants in *N.B.* asserted failure to exhaust in a motion to dismiss, which they filed as their first appearance in the case. *See* Brief of Appellant in *N.B.*, 1996 WL 33479790, at *3, *4. By putting that issue before the district court early in the case, the defendants promoted judicial efficiency. Further, by forcing the plaintiff to meet them in an administrative forum, as Congress intended, the defendant

---

3.     Consistent with the *N.B.* court's concern over deliberate parental manipulation of the IDEA, other cases illustrate that when a child leaves the school system that allegedly harmed her, a futility analysis should focus on the the circumstances surrounding her departure, rather than the departure itself. *See Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000) (student had already graduated from the school); *M.M.*, 303 F.3d at 536 n.16 (stating parents' "unilateral decision" to remove child from district schools and send her to private school did "not excuse their failure to exhaust their administrative remedies"); *Reid*, 60 F. Supp. 3d at 607–08 (student no longer attended school due to severe injuries); *Pfeiffer v. Tangipahoa Par. Sch. Bd.*, No. CIV.A.00-1233, 2000 WL 1725089, at *2 (E.D. La. Nov. 17, 2000) ("[U]nlike a situation in which necessity forces a family to change school districts, the Pfeiffers' [sic] unilaterally decided to remove their child from the Tangipahoa school system, a decision which does not excuse exhaustion.").

districts would have the first opportunity to address the child's issues, using their educational experience and expertise, and, in so doing, could develop a complete factual record for a court to review later. *See J.B.*, 721 F.3d at 594; *Payne*, 653 F.3d at 875–76. Thus, moving for dismissal at the beginning of the case was faithful to the purposes of the IDEA's exhaustion requirement.

Here, Defendants pled failure to exhaust in their answer to the First Amended Complaint, which they filed on April 15, 2014. By so pleading, Defendants indicated they then knew that Mother and Jane had not sought administrative relief and that the case needed to be dismissed so that the administrative process could play out as Congress intended. To meaningfully avail themselves of the administrative process, and to thereby fulfill the purposes of the IDEA's exhaustion requirement, Defendants should have moved for dismissal or summary judgment in April 2014 or soon thereafter. *See also* Local Civ. Rule 7.05 (D.S.C.) ("Attorneys are expected to file motions immediately after the issues raised thereby are ripe for adjudication.").

Instead, Defendants waited eighteen months to bring the issue before the Court. In the interim, the parties engaged in extensive discovery. Defendants produced an apparent plethora of evidence, at least fourteen depositions were taken, and, at the parties' requests, the scheduling order was amended six times. The trial, which was originally scheduled for April 2015, will take place less than two months from now. At this late stage, enforcing the exhaustion requirement will neither promote judicial efficiency nor "prevent[] premature interference with agency processes." *J.B.*, 721 F.3d at 594 (citation and quotation marks omitted). Rather, as the parties have already developed a record through discovery, creating another record through the administrative process would be not only futile but duplicative. The inability of exhaustion to serve these purposes counsels further against dismissal under § 1415(l). *See Learning Disabilities Ass'n of Md., Inc.*, 837 F. Supp. at 723.

These differences between *N.B.* and the present case illustrate that, in order for the IDEA's exhaustion requirement to best fulfill its purposes, it typically must be asserted and enforced at the earliest opportunity in litigation.  Under the present circumstances, requiring Mother and Jane to engage in the local administrative process would be "an empty exercise in legal formalism," *Southard*, 79 F. Supp. 3d at 560 (citation and quotation marks omitted), a burden Congress cannot have intended to impose upon parents of disabled children.  Thus, assuming *arguendo* that § 1415(l) applies to Mother's claims, the Court concludes that administrative proceedings would be futile and that dismissal for failure to exhaust would be inconsistent the purposes of § 1415(l).[4]   Accordingly, Defendants are not entitled to summary judgment under § 1415(l).

## II.    Disability Discrimination Claims Against the District

Mother brings disability discrimination causes of action under both Title II of the ADA and § 504 of the Rehabilitation Act.  The District contends Mother has failed to establish either of those causes of action.  The Court largely agrees with the District, but the record contains evidence supporting one strand of Mother's theory of liability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability,

---

4.    In addition, and separate from any concerns over futility, Defendants have effectively waived their exhaustion defense.  After nearly two years of litigation, with discovery complete, a record developed, and Mother and Jane now living hundreds of miles away, using an affirmative defense that could have been raised long ago to dismiss this case shortly before trial would be unfairly prejudicial.  *See Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 710 F.3d 527 (4th Cir. 2013) (finding defendant waived preclusion defenses by failing to assert them until sixteen months after they were known to defendant); *Babb. v. Lee Cty. Landfill SC, LLC*, 298 F.R.D. 318, 324–25 (D.S.C. 2014) (finding that although defendant raised preclusion defense in answer, defendant waived defense by failing to assert it to the Court in a timely fashion).

be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[5]  29 U.S.C. § 794(a).  Given the similar text and purposes of these two statues, they "generally are construed to impose the same requirements."  *Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999).  Accordingly, in general, a plaintiff seeking recovery under the Rehabilitation Act or Title II of the ADA must establish

> that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability.

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (citing *Baird*, 192 F.3d at 467–70; *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 & n.9 (4th Cir. 1995)).  While not explicitly conceding the first two elements, the District argues only that Mother cannot establish the third.[6]

Mother's theory of disability discrimination consists of several components.  Mother contends Spina discriminated against Jane by allowing her to skip health class, recording Jane as present in the classroom on days when she was absent, not requiring Jane to make up missed assignments, and giving Jane a perfect grade despite her absences and missed work.  Mother also contends that Addison, Ard, Brown, Chester, and Culbertson discriminated against Jane by allowing Jane to stay in the gym instead of escorting her to Spina's health class.  Finally, she contends Smith left Jane alone in the gym without adult supervision on several occasions.

---

5.    It is undisputed that the District receives federal financial assistance.

6.    In that third element, there is one substantial difference between the Rehabilitation Act and the ADA.  "A plaintiff seeking relief under Title II of the ADA must prove that disability 'played a motivating role' in the adverse action, while a plaintiff seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was 'solely by reason' of the plaintiff's disability."  *Constantine*, 411 F.3d at 501 n.17 (quoting *Baird*, 192 F.3d at 469–70).  However, that difference is not material in this case.  As discussed below, there is evidence of a discriminatory act that a jury could conclude was undertaken solely due to Jane being disabled.

According to Mother, these activities were discriminatory and caused Jane to be molested. With one exception, this theory lacks merit.

As one might expect, the record demonstrates that students are required to attend their assigned classes. They are not allowed to skip class, and teachers are not allowed to let students skip. The record also shows that on several days when Jane should have been in Spina's health class, she was in the gym, either wandering alone or mingling with schoolmates. That, by itself, would not enable a reasonable jury to determine that any District employee discriminated against Jane. However, in her deposition, Addison testified that on one occasion, Spina asked Addison to watch Jane in the gym. Moreover, Spina testified that she never allowed her non-disabled students to be in the gym during health class. These pieces of testimony, if believed, tend to show disparate treatment. Further, Spina asked Addison, an aide for disabled students, to watch Jane, and Spina acknowledges that she knew Jane had a disability. Taken together, and if believed, all of the above evidence tends to show that when Spina and Addison placed Jane in the gym that day,[7] they did so either partly or solely because Jane has a disability.

However, no reasonable jury could hold the District liable for disability discrimination based on the conduct of Ard, Brown, Chester, Culbertson, or Smith. Mother has not provided evidence that any of them treated Jane differently than non-disabled students or that any of their conduct regarding Jane was motivated by her being disabled.

Finally, as to Spina inaccurately reporting Jane as present on several days, not requiring Jane to make up missed work, and giving Jane a perfect grade, Mother has not presented evidence showing that Jane's disability played any role in any of those actions. On the contrary,

---

7.    It is not clear whether Jane was abused on the day Spina asked Addison to watch Jane. Moreover, the record does not establish that, in any of the other instances when Jane missed health class, Spina affirmatively allowed Jane to miss class or even knew Jane was skipping. Thus, Mother appears to have evidence of only one day on which disability-based discrimination caused Jane to miss class and be in the gym with C.K. To establish causation, Mother would need to show that Jane's abuse occurred that day.

Spina testified that she sometimes excuses students from making up work, depending on the nature of the assignment missed, and that she bases students' grades on the assignments they actually completed.  As for attendance records, Spina testified that she did not know why she had incorrectly marked Jane as present on several days and that sometimes she waits until the following day to record entries into the School's attendance database.  With nothing in the record to show that Spina treated non-disabled students any differently when it came to attendance, the evidence suggests the inaccuracies were the product of carelessness, not discrimination.  In any event, Mother has not established that any of this conduct caused Jane's abuse.

To summarize, Mother has shown there is a genuine issue of material fact as to whether Spina and Addison treated Jane differently, due to her disability, by placing her in the gym under Addison's watch on one day.  However, the Court will not allow any of the other components of Mother's theory to go forward.

The District asserts Mother must also establish that the discrimination against Jane was the product of either bad faith or gross misjudgment.  In *Sellers*, the Fourth Circuit held that "'either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, *at least in the context of education of [disabled] children*.'"  141 F.3d at 529 (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982)) (emphasis added); *see also Piedmont Behavioral Health Center, LLC v. Stewart*, 413 F. Supp. 2d 746, 757 (S.D. W. Va. 2006) ("[L]ike a Rehabilitation Act claim, an ADA claim brought in the educational context must show either bad faith or gross misjudgment." (quotation marks omitted)).  That "context" places a significant limitation on the rule from *Sellers*, and it is important to define that context clearly.  As the Fourth Circuit has explained,

> [t]he "context" referred to in *Sellers* . . . dealt specifically with the development of appropriate Individualized Education Plans (IEP's) for disabled children, a

> process in which "[e]xperts often disagree" and which "is often necessarily an
> arguable matter." *Id.* (quoting *Monahan*, 687 F.2d at 1170). Because negligent
> error in the development of an appropriate IEP does not amount to the kind of
> invidious discrimination at which the Rehabilitation Act or the ADA is directed,
> we adopted the heightened standard of "bad faith or gross misjudgment" for
> proving discrimination *in the specific context of developing appropriate IEP's for
> disabled children.*

*Shirey ex rel. Kyger v. City of Alexandria Sch. Bd.*, 229 F.3d 1143, at *4 (4th Cir. 2000) (table)

(per curiam) (emphasis added); *see also K.D. ex rel. J.D. v. Starr*, 55 F. Supp. 3d 782, 788–89

(D. Md. 2014) (stating *Sellers* involved "the specific context of a claim that a school system has

not provided a free appropriate education to a child with a disability"); *Bess v. Kanawha Cty. Bd.

of Educ.*, No. 2:08CV01020, 2009 WL 3062974, at *10 (S.D. W. Va. Sept. 17, 2009) (suggesting

the *Sellers* rule also applies to claims involving failure to implement an IEP's provisions).

Accordingly, the mere fact that "the activities in question take place in a school and are directed

at disabled children" does not place a disability discrimination claim within the context

contemplated in *Sellers*. *Shirey*, 229 F.3d 1143, at *4. Rather, the *Sellers* rule applies only when

the disability discrimination claim is based on a disabled child's IEP.

    In one of her briefs opposing summary judgment, Mother insists that her disability

discrimination claims are in no way based on "issues with [Jane's] IEP." (Pl.'s Mem. Opp'n

Defs.' Mot. Summ. J., ECF No. 80, at 26.) However, in her Second Amended Complaint,

Mother specifically alleged that at Jane's IEP meeting, school representatives assured Mother

that "students are always accompanied by an adult." (2d Am. Compl., ECF No. 37, at ¶ 14.)

Further, in both of her disability discrimination causes of action, Mother alleged that

"[p]rofessional standards, as well as Jane Doe's IEP, required that Defendants supervise Jane

Doe at school during school hours" and that "Defendants discriminated against Jane Doe by

failing to supervise her during the school day during school hours." (*Id.* at ¶¶ 32, 35, 37, 41, 44.)

Finally, Mother made Jane's IEP an exhibit to the Second Amended Complaint. Thus, contrary to what Mother insists in her brief, her disability discrimination claims are based partly on the implementation of Jane's IEP. To that extent, the *Sellers* rule applies to Mother's claims.

The record does not contain evidence that could lead a reasonable jury to find that Spina or Addison acted in bad faith or committed gross misjudgment by placing Jane in the gym under Addison's watch. Neither of them knew that Jane had Williams Syndrome, that Jane's disability made her vulnerable to exploitation, or that C.K. might try to molest anyone. Moreover, they agreed to put Jane in a room with a security camera and multiple trained supervisors, and Addison understood that she would watch Jane. Therefore, to the extent that Mother's disability discrimination claims are based on Jane's IEP, the District is entitled to summary judgment.

However, Mother's disability discrimination theory does not fall entirely within the *Sellers* rule. As mentioned above, Mother has alleged that, Jane's IEP notwithstanding, professional standards required District employees to supervise Jane appropriately. There is evidence that Spina's and Addison's job duties required them to supervise Jane appropriately, and a jury could reasonably conclude that putting Jane in the gym conflicted with those duties. The Fourth Circuit announced the *Sellers* rule out of a concern that, absent such a rule, liability for disability discrimination might be imposed on the basis of courts second-guessing student-specific educational decisions—matters on which even experts in special education "'often disagree.'" *Sellers*, 141 F.3d at 529 ("'Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter.'" (quoting *Monahan*, 687 F.3d at 1170)). The theory that Spina and Addison discriminated against Jane in violation of their professional responsibilities does not implicate that danger, and there is no serious room for disagreement as to whether educators must properly

supervise students.  *Cf. Shirey*, 229 F.3d 1143, at \*5 (holding *Sellers* did not apply to claim for leaving disabled student in school during bomb threat because "[t]here is nothing 'arguable' about safely evacuating disabled children from a school building during an emergency, and we doubt there are any 'experts' who would disagree about the need to do so").  Therefore, the *Sellers* rule does not apply to Mother's theory of disability discrimination based on violation of professional standards for student supervision.

In sum, Mother has met her burden to survive summary judgment, but only as to the specific theory that, in violation of professional standards, Spina and Addison discriminated against Jane by agreeing to place her in the gym on one day when she should have been in the health classroom.  With that one exception, the Court grants the District summary judgment on Mother's first and second causes of action.

### III.    Substantive Due Process Claims Against the Individual Defendants

Next, all the individual defendants—Addison, Ard, Brown, Chester, Culbertson, Smith, Spina, and Wilkerson—contend that Mother has failed to establish that any of them are liable under 42 U.S.C. § 1983.  The Court agrees.

"Section 1983 imposes liability on state actors who cause the 'deprivation of any rights, privileges, or immunities secured by the Constitution.'"  *Doe v. Rosa*, 795 F.3d 429, 436 (4th Cir. 2015) (quoting 42 U.S.C. § 1983).  "[T]hese constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity.  Accordingly, state actions that result in sexual abuse of children can be actionable under § 1983."  *Id.* at 436–37 (internal citation omitted).

However, when a private actor perpetrates the sexual abuse, state actor liability for such harm "is significantly limited."  *Rosa*, 795 F.3d at 437.  The Due Process Clause, on which

Mother's § 1983 claim is based, does not "impose an affirmative obligation on the State" to "protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 195 (1989). "As a general matter, then, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also id.* at 196–97 (stating that because "the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them"); *H.B. ex rel. C.B. v. State Bd. of Educ.*, No. 4:14-cv-204-BO, 2015 WL 2193778, at *3 (E.D.N.C. May 11, 2015) ("The Due Process Clause does not transform every tort committed by a state actor into a constitutional violation." (citing *DeShaney*, 489 U.S. at 202)).

*DeShaney* left open "two narrow circumstances" in which a state actor can be liable under § 1983 for privately caused harm. *Rosa*, 795 F.3d at 437. One of those circumstances arises in what is called the "state-created danger" doctrine. *See id.* at 438. Under the doctrine, a state actor is liable for actively creating or contributing to a dangerous situation that resulted in a private person harming the plaintiff. *See Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995) (en banc). Under such circumstances, the state actor is liable because his creation of, or contribution to, the danger is "akin to . . . directly causing harm to the injured party." *Id.* Mother bases her § 1983 claims against the individual defendants on this doctrine.

"[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Rosa*, 795 F.3d at 439. Affirmative conduct by the state actor is a key requirement of the doctrine. *Id.* at 440 (citing

*Butera v. District of Columbia*, 235 F.3d 637, 650 (D.C. Cir. 2001)); *see also DeShaney*, 489 U.S. at 200 (observing "it is the State's affirmative act" that "trigger[s] the protections of the Due Process Clause"). Failing to prevent harm is not an affirmative act under the doctrine. *See Butera*, 235 F.3d at 650 ("No constitutional liability exists where the State actors 'had no hand in creating the danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role for them.'" (quoting *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993)) (alteration in *Butera*)); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995) (affirming summary judgment where there was "no evidence that the Board took any *affirmative* action that exposed decedent to any danger to which she was not already exposed"). Moreover, affirmative conduct alone does not necessarily translate to liability. The conduct must either create the risk of private harm or increase that risk. *Rosa*, 795 F.3d at 439. Accordingly, an act that does not increase the risk of harm from a preexisting danger cannot trigger liability under the doctrine. *See id.* ("As *DeShaney* makes clear, allowing continued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risk of that danger."); *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1263 (10th Cir. 1998) ("[I]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed.").

In addition, the Fourteenth Amendment's Due Process Clause "does not apply to ordinary governmental neglect, bad policy or inaction, but rather 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *J.S. ex rel. Simpson v. Thorsen*, 766 F. Supp. 2d 695, 705 (E.D. Va. 2011) (quoting *Waybright v. Frederick Cty., Md., Dep't of Fire & Rescue Servs.*, 528 F.3d 199, 204 (4th Cir. 2008)). For that reason, the Fourth Circuit has

repeatedly held the conduct that is "wrong enough to register on a due process scale" is conduct that "'shocks the conscience,' and nothing less." *Waybright*, 528 F.3d at 204 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

The narrow contours of the state-created danger doctrine create a "demanding standard for constitutional liability." *Sargi*, 70 F.3d at 913; *see also Rosa*, 795 F.3d at 439 (stating that *DeShaney* and *Pinder* set "narrow limits" on the doctrine). Mother has failed to meet that standard with respect to any of the individual defendants.

### A.     Lack of Affirmative Acts

Mother has not shown that Ard, Brown, Chester, Culbertson, Smith, or Wilkerson undertook any affirmative acts that either created or increased the danger of C.K. molesting Jane. None of them caused Jane to be in the gym instead of the health classroom.

Additionally, as for Ard, Brown, Chester, and Culbertson, the worst Mother has shown is that they knew Jane was improperly in the gym with them and then failed to take her to health classroom or, alternatively, supervise her adequately in the gym. However, their purported failures to prevent Jane's abuse cannot support state-created danger liability. Categorically, inaction is not affirmative conduct. *See, e.g.*, *Rosa*, 795 F.3d at 439. Moreover, even if those failures could be properly viewed as affirmative acts, that conduct neither created nor increased the opportunity for Jane to be abused. Simply put, a state actor's mere proximity to privately caused harm is not the same thing as enabling it.

Smith and Wilkerson were not even in the gym during the class period when the abuse occurred, and the record indicates they learned that Jane had been skipping health class only after the incident occurred. Nonetheless, Mother contends they both contributed to Jane's risk of harm. She claims Wilkerson contributed by not requiring Perry to inform Spina, in writing, that

Jane needed constant adult supervision. District policy does require that when a special education student is to participate in a general education class, the student's special education teacher must provide the general education teacher a copy of the student's IEP and get the general education teacher to sign a form acknowledging she is aware of the student's special needs. Apparently, that policy was not followed at the School. However, the record does not show that Wilkerson affirmatively directed School employees to disregard that policy. At most, he may have failed to verify that his subordinates were following it. Thus, Wilkerson did not commit an affirmative act. Moreover, Wilkerson's arguable lack of oversight could not have created or increased Jane's danger of private harm. Spina's written job description required her to give all her students "constant attention" and to supervise them. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J., Ex. 3, Tr. Spina Dep., ECF No. 80-3, at 20–21.) Wilkerson cannot be liable under § 1983 for failing to ensure that Perry gave Spina documents that merely reiterated the supervisory responsibility Spina already knew she had.

    As for Smith, Mother claims she contributed by not ensuring that Jane went to the health classroom. However, that, too, was a failure to act, and thus it cannot constitute state-created danger.

    Finally, Mother argues that several of the individual defendants created danger for Jane by violating District policies that require special education employees to actively supervise students. According to District training materials, special education employees were required to "[n]ever leave students alone/unsupervised" and to "intervene when necessary." (Pl.'s Mem. Opp'n Brown's Mot. Summ. J., Exs. C & D, ECF Nos. 67-3 & 67-4.) Although those instructions apparently were not followed, the record does not show that any individual defendant subject to those instructions took affirmative steps that not only contravened them but

also created or increased Jane's risk of harm.  *See Rosa*, 795 F.3d at 441 (holding school president could not be liable for state-created danger for failing to follow school's policies); *cf. Robinson v. Lioi*, 536 F. App'x 340, 344 (4th Cir. 2013) (per curiam) (police officer, instead of seeing that arrest warrant for victim's husband was executed in accordance with department policy, "conspired with [the husband] to help [him] avoid being arrested"; "actively interfered with the execution of the warrant by not only failing to turn the warrant over to the proper unit . . . ., but also by warning [the husband] and giving him advice about how to avoid service of the warrant"; and "lied to avoid service of the arrest warrant by falsely contending that it could not be found").

The Court notes that Mother characterizes all the above failures to act or to adhere to policy as "deliberate decisions."  Both *Pinder* and *Rosa* make clear, however, that "although 'inaction can often be artfully recharacterized as "action," courts should resist the temptation to inject this alternate framework into omission cases.'"  *Rosa*, 795 F.3d at 441 (quoting *Pinder*, 54 F.3d at 1176 n.*).  For example, in *Rosa*, the plaintiffs alleged the defendant "deliberately conspired to conceal" allegations of child abuse.  795 F.3d at 433.  However, looking past that characterization, the Fourth Circuit concluded the evidence showed that the defendant failed to report the allegations, which was merely "an inaction on his part and not a cognizable affirmative act for liability under the state-created danger doctrine."  *Id.* at 441.  The same is true here. Mother's claims against Ard, Brown, Chester, Culbertson, Smith, and Wilkinson are "purely . . . omission claim[s]," and "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by [the male schoolmate], not by [any of these defendants]."  *Pinder*, 54 F.3d at 1175–76; *see also Rosa*, 795 F.3d at 441 (reaching same conclusion and quoting *Pinder*).

Section 1983 does not make these defendants liable for "merely fail[ing] to take actions that [they were] under no constitutional obligation to take." *Rosa*, 795 F.3d at 442.

### B.     Lack of Conscience-Shocking Behavior

As discussed in the prior section, there is evidence that on one day, Spina and Addison agreed that Jane could be in the gym instead of her health class. Arguably, that constitutes affirmative conduct that contributed to the risk of Jane being abused. However, there is no evidence in the record from which a reasonable jury could determine that Spina's or Addison's actions shock the conscience. With Addison's consent, Spina placed Jane in a gym that was equipped with a surveillance camera and in which multiple trained adult supervisors were present.[8] That fell far short of the general threshold for conscience-shocking behavior, which is "'intent[] to injure in some way unjustifiable by any government interest.'" *Waybright*, 528 F.3d at 205 (quoting *County of Sacramento*, 523 U.S. at 849).

The same is true for Ard, Brown, Chester, Culbertson, Smith, and Wilkerson. Even if their conduct could be viewed as affirmative conduct contributing to Jane's risk of abuse, the record contains no evidence that would enable a reasonable jury to find that those defendants' conduct shocks the conscience. On the contrary, and as Mother acknowledges, "[w]ith so many students in the gym, none of the aids or teachers could keep their eyes on Jane 100% of the time without neglecting their duty to supervise their own students." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J., ECF No. 80, at 10.) It is not at all shocking that educational professionals would try to fulfill their supervisory duties to their own students.

In essence, Mother has tried to make a constitutional case out of arguably negligent behavior. However, "negligently inflicted harm" is "categorically beneath the threshold of

---

8.     To be sure, there were occasions when Jane was in the gym without any adult supervision. However, C.K. committed the abuse when adults were in the gym.

constitutional due process." *County of Sacramento*, 523 U.S. at 849.  There is "a strong presumption that § 1983 due process claims which overlap state tort law should be rejected." *Waybright*, 528 F.3d at 205.  Mother has failed to overcome that presumption with proof of conscience-shocking behavior towards Jane.  Accordingly, the Court must reject her claims.

### C.    Timing of Summary Judgment

When Brown moved for summary judgment, the discovery period had not yet ended.  In her brief opposing Brown's motion, Mother suggested, but did not explicitly argue, that summary judgment would be premature.  After the discovery period ended, Mother responded to the other Defendants' motion for summary judgment, incorporating by reference her earlier opposition to Brown's motion.  To the extent that Mother has, in fact, made a prematurity argument, the Court sees no merit in it.  Mother did not file a Rule 56(d) affidavit specifying any reasons she needed additional discovery to oppose either of the summary judgment motions.  *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) ("[T]he failure to file an affidavit under Rule 56([d]) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." (citation and quotation marks omitted)).

### D.    Conclusion

The Court grants summary judgment to Addison, Ard, Brown, Chester, Culbertson, Smith, Spina, and Wilkerson on Mother's third cause of action.

## IV.  Substantive Due Process Claims Against the District

Mother also brings a § 1983 claim against the District.  Specifically, she contends the District had a custom, policy, or practice of failing to train general education teachers on the supervision of disabled students and had a practice of allowing disabled students to skip class.  However, because Mother has failed to come forward with evidence that any of the individual

defendants violated Jane's constitutional rights, Mother's § 1983 claims against the District fail as well.  *See, e.g.*, *Doe v. Georgetown Cty. Sch. Dist.*, No. 2:14-cv-01873-DCN, 2015 WL 5923610, at *5 n.2 (D.S.C. Oct. 9, 2015) ("Because [the school district employee] did not violate Doe's substantive due process rights, the District cannot be liable for failure to train, supervise, investigate, etc. under § 1983."); *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 66 F. Supp. 3d 570, 587 (M.D. Pa. 2014) ("[B]ecause [the plaintiff] was not deprived of an interest protected by the Fourteenth Amendment, Plaintiffs cannot recover from the District under § 1983 for its failure to train its teachers or principals."); *Simpson*, 766 F. Supp. 2d at 703 ("[S]upervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." (quoting *Waybright*, 528 F.3d at 203)).  Accordingly, the Court grants summary judgment for the District on Mother's fourth cause of action.

## V.      Gross Negligence Claim Against the District

Finally, the District seeks summary judgment on Mother's state-law claim that Jane's abuse was the result of the District's gross negligence.[9]

The South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10, *et seq.*, which provides the exclusive remedy in tort against public school districts, is a limited waiver of governmental immunity.  *Moore v. Florence Sch. Dist. No. 1*, 444 S.E.2d 498, 500 (S.C. 1994).  The Act contains a number of limitations upon that waiver.  *See* S.C. Code Ann. § 15-78-60.  One of those limitations, which is at issue here, provides that a governmental entity is not liable for a loss resulting from the "responsibility or duty including but not limited to supervision,

---

9.     The District has also asked, as an alternative to summary judgment on the merits, that the Court decline to exercise supplemental jurisdiction over the gross negligence claim.  The District bases its request on 28 U.S.C. § 1367(a)(3), which provides that a district court may decline to exercise supplemental jurisdiction over state-law claims after it "has dismissed all claims over which it has original jurisdiction."  Because that has not happened here, § 1367(a)(3) does not apply.

protection, control, confinement, or custody of any student . . . except when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15-78-60(25). This limitation is an affirmative defense, and thus the District has the burden of proving it did not supervise, protect, or control Jane in a grossly negligent manner. *See Strange v. S.C. Dep't of Highways & Pub. Transp.*, 445 S.E.2d 439, 440 (S.C. 1994).

"Gross negligence is the intentional, conscious failure to do something which one ought to do or the doing of something which one ought not to do. It is the failure to exercise slight care." *Hendricks v. Clemson Univ.*, 529 S.E.2d 293, 297 (S.C. Ct. App. 2000) (citations omitted), *rev'd on other grounds*, 579 S.E.2d 711 (S.C. 2003). "Gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference." *Staubes v. City of Folly Beach*, 500 S.E.2d 160, 168 (S.C. Ct. App. 1998) (citations omitted), *aff'd*, 529 S.E.2d 543 (S.C. 2000).

After carefully considering the record in the light most favorable to Mother, the Court concludes the only reasonable inference to be drawn therefrom is that the District exercised at least slight care toward Jane. As discussed above in Section II, when Spina placed Jane in the gym, she let Addison know about the placement. Spina exercised slight care by asking a trained special education paraprofessional if Jane could be in the gym, and that same professional agreed to watch Jane. Further, Addison and Ard testified they would supervise Jane on days when she was in the gym instead of her health class. Tragically, those efforts proved to be insufficient, but that does not mean the District failed to exercise even slight care towards Jane.

In opposition to the District's motion, Mother contends four South Carolina gross negligence cases involving injured students show there is a jury question as to the exercise of slight care: *Hollins ex rel. Hollins v. Richland County School District One*, 427 S.E.2d 654 (S.C.

1993); *Duncan ex. rel. Duncan v. Hampton County School District No. 2*, 517 S.E.2d 449 (S.C. Ct. App. 1999); *Doe ex rel. Roe v. Orangeburg County School District No. 2*, 495 S.E.2d 230 (S.C. Ct. App. 1997), *aff'd as modified*, 518 S.E.2d 259 (S.C. 1999); and *Smart ex rel. Clark v. Hampton County School District No. 2*, 432 S.E.2d 487 (S.C. Ct. App. 1993). However, those cases do not compel this Court to deny summary judgment. In *Hollins*, a student was killed when she was left completely unsupervised and then tried to cross a major highway. 427 S.E.2d at 655. And in *Duncan* and *Doe*, which both involved student-on-student rapes, district employees left the attackers and their victims completely unsupervised. *Duncan*, 517 S.E.2d at 452; *Doe*, 495 S.E.2d at 222–23. To be sure, Jane was left alone in the gym on several occasions. While the Court in no way condones the District allowing that to happen, Jane was not molested in an adult-free room. Rather, C.K. molested her during a gym class with several adult supervisors nearby. At least two of them tried to supervise Jane, and two more were supervising C.K.'s gym class. Finally, in *Smart*, a boy was injured in a fight with two classmates. 432 S.E.2d at 488. District employees knew the classmates had been harassing the boy for months, but instead of separating the boy from his antagonists, his teacher seated him between them. *Id.* Here, however, there was no prior history of abuse between C.K. and Jane, and no District employee placed the two students within arm's reach of each other in the face of a known danger. The Court grants the District summary judgment on Mother's fifth cause of action.

## CONCLUSION

Therefore, for the foregoing reasons, it is **ORDERED** that Defendant Shanae Brown's Motion for Summary Judgment is **GRANTED**. It is further **ORDERED** that the remaining defendants' Motion for Summary Judgment is **DENIED IN PART**, as to the one specific theory

of disability discrimination identified at the end of section II of this opinion.  In all other respects, defendants' motion is **GRANTED IN PART.**

   **AND IT IS SO ORDERED.**

           PATRICK MICHAEL DUFFY
           United States District Judge

**November 30, 2015**
**Charleston, South Carolina**